## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 10 B 47833 |
| | ) | Chapter 7 |
| GARRY CHRISPIN, | ) | Judge Donald R. Cassling |
| | ) | |
| Debtor. | ) | |
| | ) | |
| KRISTI OBERG, | ) | Adversary No. 11 A 00443 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GARRY CHRISPIN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on the complaint filed by Kristi Oberg (the "Plaintiff") to determine the dischargeability of an alleged debt against Garry Chrispin (the "Defendant") under 11 U.S.C. § 523(a)(2)(A) and (a)(6). The Plaintiff also seeks to bar the Defendant's discharge under 11 U.S.C. § 727(a)(4)(A). For the reasons set forth herein, the Court finds that the Plaintiff's claim under § 523(a)(2)(A) fails. The Court further finds that the Plaintiff has demonstrated that a $20,764.58 debt owed to her by the Defendant is nondischargeable under § 523(a)(6). In addition, the Plaintiff has established that the Defendant violated § 727(a)(4)(A) when he failed to list withdrawals from a joint bank account totaling $20,764.58 as income on his Statement of Financial Affairs. Moreover, the Defendant's failure to list this joint bank account on his Statement of Financial Affairs is also a violation of § 727(a)(4)(A). As a result, the Court denies the Defendant's discharge.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter under 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J).

## II. FACTS AND BACKGROUND

For the past ten years the Plaintiff has owned and operated a home-based hair-styling business named It's All About Hair, Inc. (Trial Tr. at p. 143, lines 12-19.) The Defendant works as a computer software analyst for Walgreen Company. (*Id.* at p. 43, lines 12-16; p. 294, lines 8-11.) Both parties were previously married to, and divorced from, other people. They met in August 2007, began a romantic relationship, and agreed to marry on February 14, 2008. The marriage never took place. The parties' romance ended in bitter acrimony, but not before their financial affairs had become entangled. That financial entanglement lies at the core of the Plaintiff's complaint, and making sense of it is not made easier by the many discrepancies between the parties' testimony. But understanding the financial interplay between the parties is necessary to a proper resolution of the Plaintiff's complaint. What follows is a summary of the main threads of the parties' financial entanglement.

### The Plaintiff Sells a Car to the Defendant

In August or September 2007, the Plaintiff sold the Defendant a Chrysler 300 vehicle (the "Vehicle") and transferred title to him pursuant to an oral agreement of sale. (Def. Ex. B; *see also* Pl. Ex. No. 7.) The Plaintiff testified that the purchase price was $20,000, while the Defendant testified that it was $10,000. Kim Koutny, the Plaintiff's friend of approximately ten years, testified that she was present during a conversation between the Plaintiff and the

2

Defendant in the summer of 2007 in which the Defendant agreed to purchase the Vehicle for $20,000. (Trial Tr. at p. 38, lines 19-25; p. 39, lines 1-20.)

The Defendant testified that he paid the Plaintiff $10,000 for the Vehicle. (*Id.* at p. 346, lines 11-15.) The Plaintiff, on the other hand, testified that she received nothing from the Defendant. (*Id.* at p. 242, lines 14-16; p. 243, lines 1-4.) According to the Defendant, in February 2008, he traded in the Vehicle and received a credit of $11,500 towards the purchase of a new car. (*Id.* at p. 373, lines 3-7; p. 374, lines 7-10.)

### The Parties Set Up a Joint Bank Account

On November 5, 2007, the parties agreed to open a joint checking account at TCF Bank (the "Joint Account"). (Pl. Ex. No. 4.) The parties dispute the original purpose of the Joint Account. The Plaintiff testified that the Defendant wanted the Joint Account for joint investments in real estate. (Trial Tr. at p. 151, lines 4-12; p. 251, lines 3-6.) The Defendant denied that this was the purpose of the Joint Account and testified that it was opened to share expenses. (*Id.* at p. 52, lines 12-16; p. 297, lines 8-12; p. 299, lines 10-17; p. 324, lines 11-17; p. 356, lines 13-25.) Whatever the original purpose of the Joint Account, it is undisputed that both parties in fact used it to pay their individual personal expenses. (*Id.* at p. 251, lines 7-11; p. 299, lines 10-17.) When the parties set up the Joint Account, they directed that the monthly statements be sent solely to the Defendant's home address. (*Id.* at p. 74, lines 3-9; p. 158, lines 10-16.)

Within the first few months of opening the Joint Account, both parties made deposits and withdrawals. (Pl. Ex. Nos. 4 & 5; Def. Exs. Q, R, S, T, U, & V.) The two largest deposits were for $65,341.82 (made in December 2007) and for $76,000 (made in November 2007). (Pl. Ex. No. 4.) The parties agree that the Plaintiff made the December 2007 deposit of $65,341.82.

However, each party claims responsibility for making the November 2007 deposit of $76,000. (*Id.*; Def. Ex. R.) The Defendant testified that the money came from the estate of his deceased father as the result of a sale of real property in Haiti. (Trial Tr. at p. 306, lines 22-25; p. 307, lines 1-14; p. 360, lines 8-18; *see also* Def. Ex. A.) On the other hand, the Plaintiff testified that she made the deposit from cash she had in her sister's safe from an inheritance she received from her deceased father's estate. (Trial Tr. at p. 160, lines 15-25; pp. 161-164.)

## The Parties Sign Contracts to Purchase Condominium Units

On November 13, 2007, the parties jointly signed contracts for the purchase of two condominium units as investment property. (Pl. Ex. No. 1.) The contracts stated that the purchase price for each unit was $93,900. (*Id.*) The condominium units were to be partially financed by mortgage loans. (*Id.*) As part of the purchase agreement, the seller agreed to rent the units for the parties for a period of twenty-three months at a monthly rate of $939 per unit. (Pl. Ex. No. 2.)

## The Parties Break Up

During the course of their relationship, the Plaintiff and the Defendant had two serious arguments. The first, a verbal altercation, occurred in January 2008. In the wake of this fight, the Plaintiff withdrew $150,000 from the Joint Account on January 25, 2008. (Pl. Ex. No. 4; Def. Ex. V.) However, because the parties reconciled, the Plaintiff deposited $150,303 back into the Joint Account three days later, on January 28, 2008. (*Id.*) Their reconciliation was short-lived. On February 3, 2008, while on a trip, the parties had another disagreement while the Plaintiff was driving a car and the Defendant was the passenger in the front seat. The Plaintiff testified that the Defendant was talking on his cell phone and became enraged when she asked him whom he was talking to. She further testified that the Defendant became violent and

repeatedly punched her in the arm.  According to the Plaintiff, she then drove to a fire station, where the police were called, and the parties were advised to go their separate ways.

### The Parties Argue Over the Joint Account

In the early morning hours of the next day, February 4, 2008, the Plaintiff checked the balance in the Joint Account and discovered that the Defendant had withdrawn approximately $142,000 shortly after their fight.  The Defendant does not dispute that he withdrew the $142,000 and that he did not return the funds.

On February 7, 2008, the Plaintiff had her attorney send the Defendant a letter demanding return of the funds.  (Pl. Ex. No. 14.)  Four days after that, on February 11, 2008, the Plaintiff personally sent an e-mail to the Defendant, again demanding return of the funds.  (Pl. Ex. No. 15; *see also* Trial Tr. at p. 62, lines 11-14.)  The Defendant refused.  A week later, on February 18, 2008, the Plaintiff filed a lawsuit against the Defendant in Illinois state court for return of the funds.  (Pl. Ex. No. 19.)

Approximately one month later, on March 18, 2008, the Defendant used the funds he had withdrawn from the Joint Account to complete the purchase of one of the two condominium units (the "Condo"), for $93,900 in cash and took title in his name alone.  (Pl. Ex. Nos. 22, 23, & 24.)  On October 17, 2008, the Defendant mortgaged the Condo for $65,000.  (Pl. Ex. No. 25.)  During 2009, the Defendant received $10,566 in rental income from the Condo.  (Pl. Ex. No. 31.)

### The Parties Settle Their Dispute Over the Joint Account

Eventually, the parties agreed to settle the state court lawsuit pursuant to an agreement requiring the Defendant to pay the Plaintiff $72,500 in two equal payments of $36,250.  (Pl. Ex. No. 26.).  The first payment of $36,250 was due on December 31, 2008 (*id.*) and was timely

made by the Defendant. He was unable to make the second payment, due on February 28, 2009.
(*Id.*) The state court case, which had previously been dismissed under the terms of the
settlement, was reinstated on April 21, 2009. (Pl. Ex. No. 27.) On November 24, 2009, in lieu
of the second payment under the settlement, the Defendant transferred title of the Condo to the
Plaintiff. (Pl. Ex. No. 28; Def. Ex. Y.)

### The Plaintiff Attempts to Close the Joint Account

On or around February 5, 2008, the Plaintiff attempted to close the Joint Account. (Trial
Tr. at p. 205, lines 1-5.) Some time after that date, she went to a branch office of TCF Bank in
Woodridge, Illinois, to confirm that the Joint Account was closed. A teller gave her a document
purportedly confirming that the Joint Account had in fact previously been closed. (Pl. Ex. No.
20; Trial Tr. at p. 204, lines 16-25; p. 205, lines 1-5; p. 208, lines 2-6.) The Plaintiff testified that
she believed that after February 5, 2008, the Joint Account was indeed closed. (Trial Tr. at p.
204, lines 23-25; p. 205, lines 1-5.)

Despite the fact that the Plaintiff had directed TCF Bank to close the Joint Account in
February 2008, the Plaintiff failed to instruct Paychex, Inc., the company responsible for
managing the payroll for her business, to stop making direct deposits into the Joint Account. As
a result, Paychex, Inc. continued to deposit the Plaintiff's income from her business into the Joint
Account. (Pl. Ex. Nos. 10 & 11; Trial Tr. at p. 214, lines 14-25; p. 215, lines 1-18.) TCF Bank
continued to generate statements for the Joint Account and send them to the only person
designated to receive them–the Defendant, who was therefore aware that deposits from the
Plaintiff's business were still being made into the Account. Indeed, he admitted at trial that he
knew (a) that the Plaintiff had attempted to close the Joint Account and (b) that Paychex, Inc.
was continuing to deposit the Plaintiff's business income into the Joint Account after she

attempted to close it. (Trial Tr. at p. 63, lines 23-25; p. 74, lines 16-22.) It is undisputed that, from June 2009 through June 2010, the Defendant withdrew $20,764.58 from the Joint Account after he knew that the Plaintiff had attempted to close it. (*Id.* at p. 75, lines 16-25; p. 76, lines 1-2; p. 381, lines 10-16.) The Defendant did not make any deposits into the Joint Account after February 2008. (Pl. Ex. No. 10.)

Because only the Defendant was receiving the statements from TCF Bank, the Plaintiff did not discover until July 2010 that the Joint Account was still open. Because she had the money she had inherited as well as $36,250 that the Defendant had paid her to settle the state court lawsuit, she did not need income from her business to pay her bills and did not check where her paychecks were being deposited. (Trial Tr. at p. 221, lines 23-25; p. 222, lines 1-25; p. 223, lines 1-9.) She discovered that the Joint Account was still open when she approached a bank teller to withdraw funds from an account belonging to her children and the teller informed her that the Joint Account was open. (*Id.* at p. 221, lines 23-25; p. 222, lines 1-18.) Upon learning of the Defendant's withdrawals from the Joint Account, the Plaintiff filed a third amended state court complaint on October 27, 2010, to add a count regarding the withdrawal of the $20,764.58. (Pl. Ex. No. 29.)

### The Defendant Files for Bankruptcy and the Plaintiff Files her Complaint

On October 26, 2010, the Defendant filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. (Pl. Ex. No. 31.) The Plaintiff filed this adversary proceeding on February 14, 2011. (Pl. Ex. No. 37.) In her three-count complaint, the Plaintiff asserts claims under 11 U.S.C. § 523(a)(2)(A), (a)(6), and § 727(a)(4)(A). The Plaintiff alleges that the Defendant fraudulently induced her to agree to marry him by avowing love for her when the true object of his affections was her money. According to the Plaintiff, the Defendant wrongfully

withdrew $142,000 and $20,764.58 from the Joint Account and used a portion of those funds to purchase the Condo in his name alone. Similarly the Plaintiff claims that the Defendant's failure to pay her $20,000 for the Vehicle was fraudulent and that debt should therefore be found nondischargeable. Finally, the Plaintiff argues that the Defendant should be denied a discharge for his failure to list the $142,000 and $20,764.58 he withdrew from the Joint Account on his Statement of Financial Affairs filed in the bankruptcy case.

The Court held an evidentiary hearing where both parties as well as several other witnesses testified. The parties' testimony was at odds regarding many key issues. The Court will address these differences as they pertain to each of the Plaintiff's claims against the Defendant.

## III. **APPLICABLE STARDARDS**

The discharge provided by the Bankruptcy Code is meant to effectuate the fresh start goal of bankruptcy relief. *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). This privilege is reserved for the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991). The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Goldberg Sec., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992). The standard of proof required to establish an exception to discharge of a debt under 11 U.S.C. § 523 is a preponderance of the evidence. *Grogan*, 498 U.S. at 291; *see also In re McFarland*, 84 F.3d 943, 946 (7th Cir. 1996). This same standard applies to denial of a discharge under 11 U.S.C. § 727(a). *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 966-67 (7th Cir. 1999). Objections to discharge are to be construed strictly against the creditor and liberally in favor of the debtor. *Stamat v. Neary*, 635 F.3d 974, 979 (7th Cir. 2011).

## IV. DISCUSSION

### A. Count I—11 U.S.C. § 523(a)(2)(A)

#### 1. Standards

Section 523 of the Code enumerates specific, limited exceptions to the dischargeability of

debts. Among them, § 523(a)(2)(A) provides as follows:

> (a) A discharge under section 727 . . . does not discharge an
> individual debtor from any debt–
>
>           . . .
>
> > (2) for money, property, services, or an extension, renewal,
> > or refinancing of credit, to the extent obtained by–
> >
> > > (A) false pretenses, a false representation, or actual
> > > fraud, other than a statement respecting the debtor's
> > > or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) lists three separate grounds for dischargeability:

false pretenses, a false representation, and actual fraud. *Id.*; *Bletnitsky v. Jairath (In re Jairath)*,

259 B.R. 308, 314 (Bankr. N.D. Ill. 2001).

#### a. False Pretenses or False Representation

In order to except a debt from discharge based on false pretenses or a false representation,

the Plaintiff must establish the following elements: (1) the Defendant made a false representation

or omission of fact; (2) that the Defendant (a) either knew to be false or made with reckless

disregard for its truth and (b) made with an intent to deceive; and (3) the Plaintiff justifiably

relied on the false representation. *See Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir.

2011); *Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010). To prevail on a § 523(a)(2)(A)

claim, all three elements must be established. *Glucona Am., Inc. v. Ardisson (In re Ardisson)*,

272 B.R. 346, 357 (Bankr. N.D. Ill. 2001). Failure to establish any one element is outcome-

determinative. *Jairath*, 259 B.R. at 314.

False pretenses in the context of § 523(a)(2)(A) include implied misrepresentations or conduct intended to create or foster a false impression. *Mem'l Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996). False pretenses are defined as follows:

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor. . . .
>
> A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996).

False pretenses do not require overt misrepresentations. *Sarama*, 192 B.R. at 928. "Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.*; *see also Shelby Shore Drugs, Inc. v. Sielschott (In re Sielschott)*, 332 B.R. 570, 573 (Bankr. C.D. Ill. 2005) (finding that "[s]ilence or concealment may constitute false pretenses"). In contrast, a false representation is an express misrepresentation that can be demonstrated either by a spoken or written statement or though conduct. *New Austin Roosevelt Currency Exch., Inc. v. Sanchez (In re Sanchez)*, 277 B.R. 904, 908 (Bankr. N.D. Ill. 2002).

### b. Actual Fraud

The Seventh Circuit Court of Appeals has defined the term "fraud" for purposes of § 523(a)(2)(A) as follows:

> Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

*McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (internal quotation omitted). "Actual fraud" is not limited to misrepresentation but may encompass "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another[.]" *Id.* (internal quotation omitted). Hence, a different analysis from misrepresentation must be utilized when a creditor alleges actual fraud. *Id.* at 893-94. The *McClellan* court opined that because common law fraud does not always take the form of a misrepresentation, a creditor need not allege misrepresentation and reliance thereon to establish a cause of action for actual fraud under § 523(a)(2)(A). *Id.* at 894. Rather, the Plaintiff must prove that: (1) a fraud occurred; (2) the Defendant intended to defraud her; and (3) the fraud created the debt at issue. *See id.* at 893-94; *Wallner v. Liebl (In re Liebl)*, 434 B.R. 529, 538 (Bankr. N.D. Ill. 2010). The fraud exception under § 523(a)(2)(A) does not reach constructive frauds, only actual ones. *McClellan*, 217 F.3d at 894. The existence of fraud may be inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor which indicates that he intended to deceive or cheat the creditor. *Cripe v. Mathis (In re Mathis)*, 360 B.R. 662, 666 (Bankr. C.D. Ill. 2006); *Sielschott*, 332 B.R. at 572.

### c. Intent

Any cause of action under § 523(a)(2)(A)–whether the grounds are false pretenses, a false representation, or actual fraud–requires proof that the debtor acted with intent to deceive. *Pearson v. Howard (In re Howard)*, 339 B.R. 913, 919 (Bankr. N.D. Ill. 2006). Proof of intent is

measured by the debtor's subjective intention at the time the representation was made. *CFC Wireforms, Inc. v. Monroe (In re Monroe)*, 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004); *Mega Marts, Inc. v. Trevisan (In re Trevisan)*, 300 B.R. 708, 717 (Bankr. E.D. Wis. 2003). It is well-established, however, that courts can consider subsequent conduct if that conduct provides an indication of the debtor's state of mind at the time of the actionable representation. *6050 Grant, LLC v. Hanson (In re Hanson)*, 437 B.R. 322, 327-28 (Bankr. N.D. Ill. 2010) (collecting cases), *aff'd*, No. 10 C 7634, slip op. (N.D. Ill. July 18, 2011).

Deciding whether a debtor had the requisite intent under § 523(a)(2)(A) is, therefore, a factual, subjective inquiry determined by examining all of the relevant circumstances, including those that took place after the debt was incurred. *Id.* at 328. Because a debtor will rarely, if ever, admit to acting with an intent to defraud, the scienter element may be inferred from the surrounding circumstances. *Hickory Point Bank & Trust, FSB v. Kucera (In re Kucera)*, 373 B.R. 878, 884 (Bankr. C.D. Ill. 2007). "Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *Jairath*, 259 B.R. at 315. After all of the evidence has been produced, a court must then determine whether the circumstances, viewed in the aggregate, present "a picture of deceptive conduct" by the debtor, indicating an intent to defraud the creditor. *Mathis*, 360 B.R. at 666; *Sielschott*, 332 B.R. at 572.

### d. Justifiable Reliance

The final element under § 523(a)(2)(A) requires a finding of causation. Reliance on false pretenses, a false representation, or actual fraud under § 523(a)(2)(A) must be "justifiable." *Field v. Mans*, 516 U.S. 59, 74-75 (1995). Justifiable reliance is an intermediate standard between actual and reasonable reliance. *See Ojeda*, 599 F.3d at 717.

Justifiable reliance is a less demanding standard than reasonable reliance; it requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." Under the justifiable reliance standard, a creditor has no duty to investigate unless the falsity of the representation would have been readily apparent. But the justifiable reliance standard is not an objective one. Rather, it is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff.

*Id.* (quoting *Field*, 516 U.S. at 71) (citations omitted).

The crux of the Plaintiff's argument under § 523(a)(2)(A) is that the Defendant entered into a relationship with her for the purpose of taking her money through false pretenses, false representations, or actual fraud. According to the Plaintiff, the Defendant committed a fraud, acted under false pretenses, or made a false misrepresentation when he: (1) transferred the $142,000 from the Joint Account into his personal account on February 4, 2008; (2) failed to pay the Plaintiff $20,000 for the Vehicle; (3) purchased the Condo in his name alone with the funds he took from the Joint Account and thereafter collected the rental income from that property; and (4) withdrew $20,764.58 from the Joint Account after the Plaintiff attempted to close it. The Court will address each act in turn.

### 2. The Defendant's Transfer of the $142,000 from the Joint Account

The Plaintiff argues that by withdrawing the $142,000 from the Joint Account, the Defendant acted under false pretenses, made a false representation, or committed actual fraud. She maintains that this money belonged to her and the Defendant withdrew it wrongfully. In support of her claim, the Plaintiff makes two arguments: First, she argues that the Defendant defrauded her by falsely telling her he loved her in order to induce her to part with her money; second, she argues that the Defendant's withdrawal of the $142,000 from the Joint Account was an act of fraud. According to the Plaintiff, she deposited the lion's share of the money into the Joint Account, and as a result, the Defendant was not entitled to withdraw the $142,000.

13

The Plaintiff's first argument must be rejected.  Both parties testified that they had a romantic relationship and only later had a falling out.  The Plaintiff introduced no evidence, in contradiction to the Defendant's testimony, that would establish that he lied to her about his initial romantic feelings for her.  Accordingly, this rationale for the Plaintiff's claim of fraud is rejected.

With respect to the Plaintiff's second argument, the Court looks to Illinois law to determine the effects of various forms of ownership interests in property.  The basic form of interest in a joint account is a statutorily created form of joint tenancy.  *See* 765 Ill. Comp. Stat. 1005/2(a) (2012).  This statute provides in relevant part that "[w]hen a deposit in any bank or trust company . . . [is] made . . . in the names of 2 or more persons payable to them when the account is opened or thereafter, the deposit or any part thereof . . . may be paid to any one of those persons. . . ."  *Id.*  "A joint bank account is not the same as a joint tenancy in real property, and is subject to the provisions of the contract between the bank and its depositors."  *Pescetto v. Colonial Trust & Sav. Bank*, 489 N.E.2d 1365, 1366 (Ill. 1986).

Under Illinois law, when two parties open a joint bank account, each party is considered to independently own the entire account, and each party individually is therefore entitled to withdraw any or all of the funds unilaterally.  *Smith v. Marcet (In re Marcet)*, 352 B.R. 462, 470 (Bankr. N.D. Ill. 2006); *Wood v. Jack Carl Assocs., Inc.*, No. 85 C 499, 1985 WL 1140, at *1 (N.D. Ill. April 29, 1985), *aff'd*, 782 F.2d 83 (7th Cir. 1986).  Neither party to a joint bank account is liable to the other joint depositor for the withdrawn funds.  *In re Vogel*, 684 N.E.2d 1035, 1038 (Ill. App. 1997).  "[T]here is a presumption that each owner of a joint account owns all funds in that account, and therefore a movant establishes a prima facie case that any money in an account belongs to a debtor when he shows that the money was in a joint account for which

14

the debtor is one of the joint owners." *In re Tucker*, 430 B.R. 499, 502 (Bankr. N.D. Ill. 2010)

(citing *In re Cloe*, 336 B.R. 762, 764 (Bankr. C.D. Ill. 2006)).

The burden then shifts to the other party to the joint account to prove what part, if any, of

the funds in the joint account belongs solely to the non-debtor joint owner. *Id.* at 502-03 (citing

*Society of Lloyd's v. Collins*, 284 F.3d 727, 731 (7th Cir. 2002)). Factors used in determining the

ownership of funds in a joint account include: (1) control over the funds in the account; (2)

contribution of funds to the account by each party; (3) whether any contribution by one party

constituted a gift to the other; (4) who paid taxes on the earnings from the account; and (5) the

purpose for which the account was established. *Highsmith v. Dep't of Public Aid*, 803 N.E.2d

652, 657 (Ill. App. Ct. 2004). "The two main factors to determine ownership of a joint account

are the exercise of control over the funds in a joint account . . . [and] contributions to the account

. . . ." *Id.*

The parties do not dispute that the Joint Account was an account owned jointly by them.[1]

The Court must determine whether the Plaintiff has demonstrated that the $142,000 belonged

solely to her and not to the Defendant. In making that determination, the Court will address each

factor.

### a. Contributions to the Joint Account

At trial, both parties testified regarding the sources of the deposits made during the

existence of the Joint Account. They submitted evidence in the form of deposit slips, checks,

and bank statements. (Pl. Ex. Nos. 4 & 5; Def. Exs. Q, R, S, T, U, & V.) The Plaintiff testified

---

[1] The Plaintiff argues that an agreement to establish a joint account was never formed because there was no meeting of the minds. She maintains that she thought the Joint Account was being opened for the parties to purchase real estate together. Further, she states that she did not have advice of counsel, the Defendant told her not to tell anyone about the Joint Account, and the Joint Account was set up one week before the parties signed the contracts to purchase the two condominium units. The Court rejects this argument. The Plaintiff admitted that she was paying her personal expenses from the Joint Account. Thus, her use of the Joint Account to pay personal bills undercuts her argument that it was opened for the sole purpose of investing in real estate.

that she made numerous deposits totaling $162,390.08[2] from November 2007 through December 2007. (Trial Tr. at pp. 159-61; pp. 164-67; pp. 174-75.)[3] The Defendant's testimony indicated that he made deposits during the time period of November 2007 through January 2008 totaling approximately $106,650.[4] (*Id.* at pp. 301-05; pp. 311-21.) The Defendant also testified that his paycheck deposits were made directly into the Joint Account. (*Id.* at p. 299, lines 2-9.)

---

[2] Those deposits made by the Plaintiff include the following:

| Deposit Amount | Deposit Date |
|---|---|
| $208.60 | 11-05-07 |
| $4,000.00 | November 2007 (specific date not given) |
| $76,000.00 | 11-13-07 |
| $968.00 | 11-14-07 |
| $235.00 | 11-19-07 |
| $163.00 | 11-19-07 |
| $990.00 | 11-23-07 |
| $6,653.20 | 11-26-07 |
| $1,329.00 | 12-03-07 |
| $1,435.45 | 12-11-07 |
| $65,341.83 | 12-17-07 |
| $3,000.00 | 12-17-07 |
| $1,266.00 | 12-17-07 |
| $800.00 | 12-17-07 |
| **$162,390.08** | **TOTAL** |

[3] In her post-trial brief, the Plaintiff asserts that she made deposits into the Joint Account totaling $183,700 before she attempted to close it in February of 2008. (Pl. Post-Trial Brief at pp. 33 & 35.) The Plaintiff's testimony does not support this amount. It appears that she relied on Exhibit No. 4 to calculate this sum. While this exhibit was admitted into evidence, the handwritten notations of the Plaintiff purporting to show who made the specific deposits into the Joint Account were not admitted into evidence. Thus, the Court is unable to determine from the Plaintiff's testimony or documentary evidence how she arrived at this sum.

[4] Those deposits made by the Defendant include the following:

| Deposit Amount | Deposit Date |
|---|---|
| $4,000.00 | 11-12-07 |
| $76,000.00 | 11-13-07 |
| $15,000.00 | 11-26-07 |
| $1,000.00 | 01-02-08 |
| $3,900.00 | 01-22-08 |
| $50.00 | 01-21-08 |
| $3,500.00 | (specific date not given) |
| $3,100.00 | (specific date not given) |
| $100.00 | 01-24-08 |
| **$106,650.00** | **TOTAL** |

16

Each party testified that he or she was individually the sole source of one of the largest of the deposits made into the Joint Account-a cash deposit of $76,000. The deposit slip was signed by the Defendant (Def. Ex. R), who testified that the funds came from money he inherited from his father's estate. (Trial Tr. at p. 305, lines 9-18; p. 306, lines 22-25; p. 307, lines 1-11; p. 360, lines 8-18.) Although the Plaintiff agreed that the Defendant's name was on this deposit slip, she testified that she was the source of those funds. (*Id.* at p. 185, lines 13-25; p. 186, lines 1-9.)

As previously discussed, each party offered testimony and documents in support of the assertion that he or she was the source of the $76,000 deposit into the Joint Account. The testimony from the parties and their respective witnesses was in direct conflict on this issue, and the documentary evidence was of little assistance. The Court is in the best position to assess the credibility of the witnesses and weigh the evidence. *See Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) (noting that deference is given to a trial court's findings that involve credibility of witnesses because only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is stated); *Torres v. Wis. Dept. of Health & Social Servs.*, 838 F.2d 944, 946 (7th Cir. 1988) (citing *Anderson*). "[A] court . . . may take into account a witness'[s] interest in the outcome of the case, his intentions, his seeming honesty, and his conduct on the witness stand." *Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 87 (Bankr. N.D. Ill. 2002) (citing *Welch v. Tenn. Valley Auth.*, 108 F.2d 95, 101 (6th Cir. 1939)).

The Court observed the demeanor of the Plaintiff and the Defendant and finds that both offered self-serving testimony regarding the source of the $76,000 deposit. After carefully considering their testimony, the Court is unable to determine which party is telling the truth with

respect to this issue. Thus, the conflicting evidence prevents the Court from determining which party in fact provided the deposited funds.

### b.  Control over the Funds in the Joint Account

It is undisputed that both the Plaintiff and the Defendant had control over and equal access to the Joint Account. It is also undisputed that both parties had the ability to make deposits into and withdrawals from the Joint Account. Each party paid some of his or her personal expenses from the Joint Account. The Joint Account statements, however, were sent only to the Defendant at his home address. Nevertheless, both the Plaintiff and the Defendant had access to the Joint Account information on-line.

### c.  Whether any Contribution was a Gift

The parties presented no evidence about whether any contribution by either the Plaintiff or the Defendant to the Joint Account constituted a gift to the other.

### d.  Who Paid Taxes on the Earnings from the Joint Account

The parties presented no evidence regarding who paid taxes on the earnings from the Joint Account.

### e.  The Purpose for Which the Joint Account was Established

The parties' testimony was in conflict on this factor. The Plaintiff testified that the purpose of opening the Joint Account was to invest in real property. The Defendant, on the other hand, testified that the purpose of the Joint Account was for the parties to share expenses. It is undisputed that both parties paid individual debts from the Joint Account.

### f.  Analysis of the Factors

After considering all these factors, the Court finds that the Plaintiff did not establish by a preponderance of the evidence that the $142,000 in the Joint Account belonged solely to her.

Thus, the Plaintiff failed to rebut the presumption that the funds in the Joint Account belonged to both her and the Defendant. Accordingly, as a matter of Illinois law, both the Plaintiff and the Defendant were each entitled to unilaterally withdraw any or all funds from the Joint Account without being liable to reimburse the other. The Defendant's withdrawal of the $142,000 from the Joint Account, therefore, was not improper and could not be considered an act of fraud under § 523(a)(2)(A).

Moreover, the Plaintiff failed to present evidence in support of her argument that the $142,000 transfer was the result of false pretenses or a false representation. The Plaintiff's testimony regarding the physical altercation between the parties that occurred immediately before the transfer has no relevance to the issue of whether the Defendant made a false representation inducing the Plaintiff to transfer property to him. Not only did that altercation occur after the funds had been deposited into the Joint Account, there is no way to construe the altercation as a representation of any sort, false or true.

The Plaintiff argues that the Defendant intentionally misrepresented to her that he would contribute to the Joint Account for the purpose of investing in real estate. The Plaintiff maintains that the Defendant knew at the time he made the representation that he did not have the financial ability to contribute to the Joint Account, but the Plaintiff offered no evidence to support this contention. Even though the parties dispute, and the Court is unable to determine, who was the source of the $76,000 deposit, the Plaintiff does not dispute that the Defendant made other deposits into the Joint Account. Accordingly, the Court finds that the Plaintiff failed to prove by a preponderance of evidence either (1) that the Defendant made a misrepresentation regarding his financial ability to make contributions to the Joint Account, or (2) that the Defendant failed to make deposits into the Joint Account.

Nor did the Plaintiff prove by a preponderance of the evidence that the Defendant made a false representation of any sort to induce her to open the Joint Account. As discussed above, the Plaintiff failed to introduce any evidence that established that the Defendant entered into a romantic relationship with her for the ulterior purpose of taking her money. The Plaintiff's testimony that the Defendant behaved rudely and even violently towards her after the Joint Account had been set up may be relevant to the issue of whether the Defendant is a cad, but it does not amount to proof of any deceit, artifice, or trick on the part of the Defendant to cheat the Plaintiff out of her money. Similarly, the fact that the relationship ended badly, that the Defendant withdrew $142,000 from the Joint Account, and that he then used it to purchase the Condo in his name alone may be ungentlemanly and even despicable behavior, but it does not prove that the Defendant intended to deceive or cheat the Plaintiff when the Joint Account was created.

In sum, the Court finds that the Defendant's withdrawal of the $142,000 from the Joint Account did not constitute actual fraud, false pretenses, or a false representation. Therefore, the Plaintiff's claim under § 523(a)(2)(A) regarding the $142,000 withdrawal fails.

### 3. The Plaintiff's Transfer of the Vehicle to the Defendant

Next the Plaintiff alleges that the Defendant made a knowingly false representation with the intent to deceive her when he agreed to pay $20,000 for the Vehicle then failed to do so. The Defendant testified that the parties agreed to a purchase price of $10,000, and that he made a cash payment to the Plaintiff in that amount. The Plaintiff denied that the Defendant made any payment at all to her for the Vehicle.

In support of her claim that the agreed purchase price was $20,000 rather than $10,000, the Plaintiff's friend, Kim Koutny, testified that she was present during a conversation between

the Plaintiff and the Defendant in which the Defendant agreed to purchase the Vehicle for $20,000. The Plaintiff also points to the Defendant's testimony that he traded-in the Vehicle for $11,500. The Plaintiff argues that because a vehicle's trade-in value would be less than its fair market price, this amount is more consistent with a negotiated purchase price of $20,000 than $10,000.

Even if the Court were to conclude that the Defendant had agreed to pay $20,000 for the Vehicle, the Plaintiff has failed to introduce any evidence to establish that the Defendant's conduct amounted to fraud, false pretenses, or a false representation under § 523(a)(2)(A). While it is true that promises to perform future actions may be considered misrepresentations under this section where a debtor never intended to perform, *Green v. Pawlinski (In re Pawlinski)*, 170 B.R. 380, 393 (Bankr. N.D. Ill. 1994), the Plaintiff has introduced no evidence to establish that the Defendant never intended to pay the Plaintiff for the Vehicle. Further, even if the Court accepts the Plaintiff's testimony that the Defendant never paid her for the Vehicle, that failure constitutes nothing more than a breach of an oral agreement, which, on this record, does not rise to the level of a fraud, false pretenses, or a misrepresentation because there was no evidence adduced to show that the Defendant never intended to perform.

Accordingly, the Plaintiff's claim that the $20,000 debt for the Vehicle be held nondischargeable under § 523(a)(2)(A) fails.

### 4. The Defendant's Purchase of the Condo and the Rent He Collected

Next, the Plaintiff maintains that the Defendant purchased the Condo in his name alone with funds he wrongfully withdrew from the Joint Account and then collected the rental income. She alleges that this purchase was the result of fraud, misrepresentation, or false pretenses because the Defendant had planned to purchase a condominium unit in the same complex before

meeting her and he entered into a relationship with her for the purpose of obtaining her money to complete the purchase.

As discussed previously, the Plaintiff failed to introduce any evidence to establish that the Defendant entered into a relationship with the Plaintiff under false pretenses. Moreover, as the Court previously held, the Defendant's withdrawal of the $142,000 was not fraudulent, a false representation, or the result of false pretenses because the Defendant was entitled to unilaterally withdraw those funds from the Joint Account. Further, if his purchase of the Condo was not fraudulent or based on false representations or false pretenses, then by definition his collection of rental income from the Condo would not be a violation of § 523(a)(2)(A). Moreover, the Plaintiff testified that she chose not to close on the purchase of the condominium units because she closed the Joint Account. (Trial Tr. at p. 189, lines 11-17.) That the Defendant moved ahead with the purchase does not constitute fraud, false pretenses, or a false representation. Therefore, the Plaintiff's claim as to the Defendant's purchase of the Condo and the rent he collected fails under § 523(a)(2)(A).

### 5. The Defendant's Withdrawals from the Joint Account Totaling $20,764.58 after the Plaintiff Attempted to Close the Account

Finally, the Plaintiff argues that the Defendant's withdrawals of $20,764.58 from the Joint Account from March 2008 through June 2010 were the result of fraud, false pretenses, or a misrepresentation. It is undisputed that the Plaintiff inadvertently permitted those funds to be deposited into the Joint Account after she believed that the Joint Account had successfully been closed. It is also undisputed that (1) the Defendant knew that the Plaintiff had tried to close the Joint Account, (2) the Defendant withdrew funds from the Joint Account even though he made no deposits into the Joint Account during that time period, and (3) the Defendant withdrew funds

from the Joint Account even though he knew that the sole source of those funds was the Plaintiff's paycheck deposits.

As the Court previously stated, there is a presumption that the Plaintiff and the Defendant each own all of the funds in the Joint Account. The Plaintiff may rebut that presumption, however, by showing that the funds in the Joint Account belong solely to her. The Court must examine the five factors discussed previously to determine whether the Plaintiff has successfully rebutted the presumption of joint ownership of the $20,764.58.

### a.  Contributions to the Joint Account

The parties do not dispute that the only funds deposited into the Joint Account after February 2008 came from the Plaintiff. The Defendant made no deposits whatsoever after that time. The Plaintiff was the sole source of contributions to the Joint Account from February 2008 until the Joint Account was actually closed in July 2010. Because the Joint Account statements continued to be sent to the Defendant at this home, he knew that the Plaintiff's income from her business was being deposited into the Joint Account. Even though he admitted that he knew the Plaintiff had attempted to close the Joint Account in or around February 2008, more than one year after their relationship ended, in June 2009, he began paying his mortgage from the Joint Account.

### b.  Control Over the Funds in the Joint Account

It is undisputed that the Plaintiff and the Defendant were equally entitled to access to and control over the funds in the Joint Account. However, from February 5, 2008, until July 2010, the Plaintiff did not access the Joint Account for information or make any withdrawals, nor did she actively exercise control over the funds in the Joint Account in any way.

### c.   Whether any Contribution was a Gift

Because the Defendant admitted that he knew that the Plaintiff attempted to close the Joint Account in February 2008, and because it is undisputed that the parties' romantic relationship ended after their altercation that same month, the Court finds that the Defendant knew or should have known that the Plaintiff did not intend to make a gift of her paychecks to him subsequent to that time.

### d.   Who Paid Taxes on the Earnings from the Joint Account

Neither party introduced evidence regarding who paid the taxes on the earnings from the Joint Account.

### e.   The Purpose for Which the Joint Account was Established

As discussed above, the testimony regarding the purpose of the Joint Account was conflicting, but it is undisputed that both parties paid personal bills from the Joint Account, although the Plaintiff ceased to do so after February 2008, when she thought she had closed the Joint Account. Regardless of what the parties' intent was as of the date of creation of the Joint Account, the Court finds that both parties knew that they no longer had a common purpose for continuing the Joint Account after February 2008.

### f.   Analysis of the Factors

Based on these factors, the Court finds that the Plaintiff has successfully rebutted the presumption of joint ownership of the $20,764.58 withdrawn by the Defendant from the Joint Account. The Plaintiff has established that those funds belonged solely to her. The Plaintiff was the sole contributor of those funds to the Joint Account. Her failure to exercise her right to control the funds was due to her mistaken belief that the Joint Account in which they were deposited had already been closed. The Defendant had no basis for believing that the Plaintiff

ever intended to make him a gift of that amount. The purpose for which the Joint Account was established (whatever that was) ceased to exist well before the Defendant withdrew the disputed funds.

Next, the Court must determine whether the Defendant's withdrawal of those funds was the result of fraud, false pretenses, or a false representation. The Court finds that the Plaintiff failed to establish that the Defendant's withdrawal of the $20,764.58 is a nondischargeable debt under § 523(a)(2)(A). The Plaintiff failed to prove that the Defendant, with the intent to deceive, knowingly made a false representation that the Plaintiff justifiably relied upon. Further, the Plaintiff failed to establish that the Defendant acted fraudulently. It has been established that the Plaintiff's paychecks continued to be deposited into the Joint Account, unbeknown to the Plaintiff, and that approximately one year after the Plaintiff attempted to close the Joint Account, the Defendant began to make withdrawals and did not make any deposits. But although this may be wrongful for other reasons, it does not amount to fraud. Consequently, the Plaintiff's claim that the $20,764.58 debt should be nondischargeable under § 523(a)(2)(A) fails.

## B. Count II—11 U.S.C. § 523(a)(6)

### 1. Standards

Section 523(a)(6) of the Code provides as follows:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt–
>
> . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

11 U.S.C. § 523(a)(6). For a finding of nondischargeability of a debt under § 523(a)(6), the Plaintiff must prove three elements by a preponderance of the evidence: (1) the Defendant intended to and caused an injury to her person or property interest; (2) the Defendant's actions

were willful; and (3) the Defendant's actions were malicious. *See Zamora v. Jacobs (In re Jacobs)*, 448 B.R. 453, 480 (Bankr. N.D. Ill. 2011); *Birriel v. Odeh (In re Odeh)*, 431 B.R. 807, 817 (Bankr. N.D. Ill. 2010). The Seventh Circuit has recently stated that a willful and malicious injury "is one that the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act." *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 324 (7th Cir. 2012).

"Injury" has been defined as "the violation of another's legal right or the infliction of an actionable wrong." *Mut. Mgmt. Servs., Inc. v. Fairgrieves (In re Fairgrieves)*, 426 B.R. 748, 757 (Bankr. N.D. Ill. 2010). Injuries contemplated by § 523(a)(6) are not confined to physical damage; an injury to intangible personal or property rights will suffice. *Id.* "The word 'willful' in [section 523](a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

Under *Geiger* and its stringent standards, to satisfy the requirements of § 523(a)(6), a creditor must plead and prove that the debtor actually intended to harm him and not merely that the debtor acted intentionally and the creditor was thus harmed. 523 U.S. at 61-62. In other words, the debtor must have intended the tortious consequences of his act. *Id.*; *Jendusa-Nicolai*, 677 F.3d at 324. Injuries either negligently or recklessly inflicted do not fall within the ambit of § 523(a)(6). *Geiger*, 523 U.S. at 64.

The United States Supreme Court has not defined the scope of the term "intent" used to describe willful conduct. *Fairgrieves*, 426 B.R. at 757. Recent decisions, however, have generally found that either a showing of subjective intent to injure the creditor or a showing of subjective knowledge by the debtor that injury is substantially certain to result from his acts can

establish the intent required by *Geiger*. *Jendusa-Nicolai*, 677 F.3d at 324; *Fairgrieves*, 426 B.R. at 757 (collecting cases).

As to the malice element, conduct is "malicious" if it is taken "in conscious disregard of one's duties or without just cause or excuse. . . ." *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994). The test for malice under § 523(a)(6) is (1) a wrongful act, (2) done intentionally, (3) which causes injury to the creditor, and (4) is done without just cause or excuse. *Park Nat'l Bank & Trust of Chi. v. Paul (In re Paul)*, 266 B.R. 686, 696 (Bankr. N.D. Ill. 2001). A debtor does not have to act with ill will or a specific intent to do harm to the creditor for the conduct to be malicious. *Thirtyacre*, 36 F.3d at 700. Rather, the key to maliciousness is "consciousness of wrongdoing." *Centier Bank v. Young (In re Young)*, 428 B.R. 804, 818 (Bankr. N.D. Ind. 2010).

"Whether an actor behaved willfully and maliciously is ultimately a question of fact reserved for the trier of fact." *Thirtyacre*, 36 F.3d at 700. Because a person will rarely admit to acting in a willful and malicious manner, those requirements must be inferred from the circumstances surrounding the injury. *Cutler v. Lazzara (In re Lazzara)*, 287 B.R. 714, 723 (Bankr. N.D. Ill. 2002).

The Plaintiff argues that the Defendant caused a willful and malicious financial injury to her when he: (1) withdrew $142,000 from the Joint Account on February 4, 2008; (2) withdrew $20,764.58 from the Joint Account after she attempted to close it in February 2008; and (3) failed to pay her $20,000 for the Vehicle. The Court will address each alleged injury to the Plaintiff in turn.

### 2. The Defendant's Withdrawal of $142,000 from the Joint Account

First, the Plaintiff alleges that the Defendant caused her financial injury when he withdrew the $142,000 from the Joint Account. As the Court previously stated, because either

party was entitled to unilaterally withdraw all of the funds from the Joint Account, the Plaintiff

has failed to establish that the Defendant's withdrawal of the $142,000 was a wrongful act done

without just cause or with the intent to injure her. The Defendant, as a party to the Joint

Account, had the right to withdraw the $142,000, and his doing so did not constitute a willful and

malicious injury to the Plaintiff. As the Court found *infra*, the Plaintiff failed to rebut the

presumption that both she and the Defendant owned the $142,000 in the Joint Account.

Accordingly, the Plaintiff's claim under § 523(a)(6) with respect to the $142,000 withdrawal by

the Defendant fails.

### 3. The Defendant's Withdrawal of $20,764.58 from the Joint Account

Next, the Plaintiff argues that the Defendant caused her willful and malicious injury when

he withdrew $20,764.58 in paycheck deposits from the Plaintiff's business that had accumulated

in the Joint Account from March 2008 through June 2010. According to the Plaintiff, she closed

the Joint Account in February 2008, yet her paycheck deposits continued to be made into the

Joint Account. The Defendant made withdrawals from the Joint Account even though he made

no deposits during that time period and knew the money that he was withdrawing came solely

from the Plaintiff.

The Court finds that the Plaintiff proved by a preponderance of the evidence that the

Defendant's withdrawal of the $20,764.58 from the Joint Account willfully and maliciously

caused her financial injury. First, as the Court previously found, the Plaintiff rebutted the

presumption that both she and the Defendant were the owners of these funds. In fact, the

Plaintiff was the sole owner of those funds. The Defendant knew that the Plaintiff attempted to

close the Joint Account. He received all of the statements for the Joint Account at his home

address. The Defendant was aware that the Plaintiff's paycheck deposits from her business were

being automatically deposited into the Joint Account. He further knew that he was not making any deposits into the Joint Account and that her paychecks were the only source of deposits into the Joint Account. Because of the tumultuous nature of the relationship and subsequent breakup, the Court infers that the Defendant knew the Plaintiff would not agree to him withdrawing the funds and he chose to take the money anyway. The Defendant withdrew $20,764.58 from the Joint Account beginning in June 2009, knowing that he was causing a financial injury to the Plaintiff without just cause or excuse. As a result, the Court holds that the $20,764.58 is a non-dischargeable debt under § 523(a)(6).

### a. The Defendant's Affirmative Defenses-Laches

The Defendant asserts the doctrine of laches as an affirmative defense. Laches is an equitable defense that is properly invoked when "unreasonable delay in pressing one's rights . . . prejudices the defendant." *Cook v. City of Chi.*, 192 F.3d 693, 695 (7th Cir. 1999). In order for laches to apply in a case, the party asserting the defense must establish two elements: (1) an unreasonable and inexcusable lack of diligence by the party against whom the defense is asserted; and (2) material prejudice arising from the delay. *Smith v. Caterpillar, Inc.*, 338 F.3d 730, 733 (7th Cir. 2003). A defendant is prejudiced from delay in asserting a claim where the defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 824 (7th Cir. 1999). The Seventh Circuit has noted that "'laches is a question of degree' and that 'if only a short period of time has elapsed since the accrual of the claim, the magnitude of prejudice required before the suit should be barred is great, whereas if the delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice is required.'" *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 795 (7th Cir. 2002) (quoting *Hot Wax*, 191 F.3d at 824).

29

The Defendant argues that for a period of more than two years after February of 2008, the Plaintiff allowed him to access the Joint Account and use the funds to make his mortgage payment. According to the Defendant, the Plaintiff "slept on any rights she might have had to evoke control" over the Joint Account. (Def. Post-Trial Brief at p. 17.)

First, the Defendant must show an unreasonable lack of diligence on the part of the Plaintiff. The Plaintiff testified that she was not aware that her paycheck deposits were going into the Joint Account until July 2010. She candidly attributed her failure to check where these deposits were going to negligence, and she admitted that this failure was a mistake. (Trial Tr. at p. 278, lines 18-21.) The Plaintiff was running her business and raising her children and was not relying on income from her business to pay her bills because she had money from an inheritance and from the settlement of the state court lawsuit against the Defendant. (*Id.* at p. 278, lines 2-9.)

The Court finds that the Defendant failed to prove an unreasonable and inexcusable lack of diligence by the Plaintiff. Her failure to detect that her paycheck deposits were going into the Joint Account was due to the fact that she thought that that Account had been closed. She had visited a TCF Bank branch in person and relied on an e-mail provided by a teller that the Joint Account had been closed. (Pl. Ex. No. 20; Trial Tr. at p. 210, lines 4-24.) Her reliance on the document she received from the bank teller informing her that the Joint Account was closed subsequently proved to be ill-founded but it was certainly not unreasonable. Further, the Plaintiff testified that she thought her paychecks were going into another account she had at Midwest Bank. (Trial Tr. at p. 277, lines 8-23.) When the Plaintiff discovered that the Joint Account was still open, she immediately instructed Paychex, Inc. to stop making deposits into the Account. Hence, the Court finds that the Plaintiff acted diligently once she realized that the

Joint Account had not been closed. Nothing in the evidence shows either an unreasonable or inexcusable lack of diligence.

Next, the Defendant must show that the delay materially prejudiced him. The Court finds that the Defendant failed to establish this element. There was no evidence adduced to show that the Defendant changed his position. As a result, the Defendant's laches defense fails.

### 4. The Defendant's Purchase of the Vehicle

Lastly, the Plaintiff argues that the Defendant caused her a willful and malicious financial injury when he failed to pay her $20,000 for the Vehicle pursuant to their oral agreement. As the Court previously stated, the testimony was conflicting regarding the purchase price and whether the Defendant paid the Plaintiff any money for the Vehicle.

The Plaintiff's allegation that the Defendant failed to pay her anything for the Vehicle constitutes a breach of contract claim. Section 523(a)(6) is limited to debts resulting from tortious conduct. *Odeh*, 431 B.R. at 817; *Wish Acquisition, LLC v. Salvino (In re Salvino)*, 373 B.R. 578, 589 (Bankr. N.D. Ill. 2007), *aff'd*, No. 07 C 4756, 2008 WL 182241 (N.D. Ill. Jan. 18, 2008). It does not apply to breaches of contract, even intentional ones. *Neiman v. Irmen (In re Irmen)*, 379 B.R. 299, 312-13 (Bankr. N.D. Ill. 2007). Thus the Defendant's breach of the oral agreement he had with the Plaintiff, even if intentional, does not by itself constitute a willful and malicious injury under § 523(a)(6). Hence, the Plaintiff's claim under § 523(a)(6) fails with respect to the Vehicle.

### C. Count III—11 U.S.C. § 727(a)(4)(A)

### 1. Standards

Section 727(a)(4) bars a debtor's discharge if he knowingly and fraudulently makes a false oath in connection with the case. Specifically, § 727(a)(4) provides as follows:

> (a) The court shall grant the debtor a discharge, unless–
>
> > (4) the debtor knowingly and fraudulently, in or in connection with the case–
> >
> > > (A) made a false oath or account[.]

11 U.S.C. § 727(a)(4)(A). The purpose of § 727(a)(4) is to enforce a debtor's duty of disclosure and to ensure that the debtor provides reliable information to those who have an interest in the administration of the estate. *Brandt v. Carlson (In re Carlson)*, 231 B.R. 640, 655 (Bankr. N.D. Ill. 1999), *aff'd*, 250 B.R. 366 (N.D. Ill. 2000), *aff'd*, 263 F.3d 748 (7th Cir. 2001). The trustee and the creditors have a right to information that will allow them to evaluate the case and administer the estate's property. *Clean Cut Tree Serv., Inc. v. Costello (In re Costello)*, 299 B.R. 882, 899 (Bankr. N.D. Ill. 2003). Thus, "[c]omplete financial disclosure is a condition precedent to the privilege of discharge." *Ardisson*, 272 B.R. at 359; *see also Fosco*, 289 B.R. at 93. To receive a "fresh start" under the Bankruptcy Code, a debtor must furnish full and accurate information about himself and his affairs; all assets and ownership interests must be disclosed, and all questions in the schedules and statement of financial affairs must be answered completely and honestly. *Schechter v. Hansen (In re Hansen)*, 325 B.R. 746, 757 (Bankr. N.D. Ill. 2005).

In order to prevail, the Plaintiff must establish five elements under § 727(a)(4)(A): (1) the Defendant made a statement under oath; (2) the statement was false; (3) the Defendant knew the statement was false; (4) the Defendant made the statement with the intent to deceive; and (5) the statement related materially to the bankruptcy case. *See Stamat*, 635 F.3d at 978.

A debtor's petition, schedules, and statement of financial affairs are statements under oath for purposes of this section. *Rutili v. O'Neill (In re O'Neill)*, 468 B.R. 308, 327 (Bankr. N.D. Ill. 2012); *Norton v. Cole (In re Cole)*, 378 B.R. 215, 221 (Bankr. N.D. Ill. 2007). Whether a debtor made a false oath within the meaning of § 727(a)(4)(A) is a question of fact. *Costello*,

299 B.R. at 899.  A false oath may include a knowing and fraudulent omission.  *Rafool v. Wilson (In re Wilson)*, 290 B.R. 333, 337 (Bankr. C.D. Ill. 2002); *Britton Motor Serv., Inc. v. Krich (In re Krich)*, 97 B.R. 919, 923 (Bankr. N.D. Ill. 1988) ("Filing of false schedules with material omissions or misrepresentations with an intent to mislead creditors and the trustee as to a debtor's actual financial condition constitutes a false oath under section 727(a)(4)(A).").

"Intent to defraud involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression." *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998).  To find the requisite degree of fraudulent intent, a court must find that the debtor knowingly intended to defraud or engaged in behavior that displayed a reckless disregard for the truth. *In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992). Reckless disregard for the truth is sufficient to prove fraudulent intent. *Stamat*, 635 F.3d at 982. Reckless disregard means "not caring whether some representation is true or false. . . ." *Chavin*, 150 F.3d at 728.  If a debtor's bankruptcy schedules reflect a "reckless indifference to the truth" then the party seeking denial of the discharge need not offer any further evidence of fraud. *Costello*, 299 B.R. at 900.  Direct evidence of intent to defraud may not be available. *Id.*  Thus, the requisite intent under § 727(a)(4)(A) may be inferred from circumstantial evidence or by inference based on a course of conduct. *Yonikus*, 974 F.2d at 905.

A debtor's false oath must relate to a material matter before it will bar a discharge in bankruptcy. *In re Agnew*, 818 F.2d 1284, 1290 (7th Cir. 1987).  The test for materiality of the subject matter of a false oath is whether it "'bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.'" *Stamat*, 635 F.3d at 982 (quoting *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1198 (9th Cir. 2010)).  A false oath may be material even though it does

not result in any detriment or prejudice to the creditor. *Id.*; *Richardson v. Von Behren (In re Von Behren)*, 314 B.R. 169, 180 (Bankr. C.D. Ill. 2004).

The Plaintiff alleges that the Defendant knowingly and fraudulently made a false oath on his Statement of Financial Affairs ("SOFA") when he failed to disclose the $142,000 in funds he withdrew from the Joint Account in 2008 and the $20,764.58 that he withdrew from that Joint Account in 2009 through July 2010. She contends that the Defendant failed to list these monies as "income" on his SOFA.

### 2. The Defendant's Withdrawal of the $142,000 from the Joint Account

First, the Court must determine whether the $142,000 withdrawal the Defendant made from the Joint Account during the two-year look-back period is considered "income" for purposes of the SOFA. The Plaintiff cites no authority for the proposition that withdrawals from a joint bank account constitute "income" that must be reported on the SOFA.

The SOFA form requires a debtor to list income from employment or operation of business two years immediately preceding the calendar year, as well as income from sources other than employment or operation of a business during the two years immediately preceding the commencement of the case. The Bankruptcy Code does not define the term "income." That term with respect to a SOFA has been defined as the "money or other form of payment that one receives . . . from employment, business, investments, royalties, gifts and the like." *Shinhan Bank Am. Inc. v. Kim (In re Kim)*, Bankr. No. 10-66727-JRS; Adv. No. 10-06500-JRS, 2011 WL 5902461, at *7 (Bankr. N.D. Ga. Oct. 27, 2011). Income has further been defined as "[t]he money or other form of payment that one receives, usu[ally] periodically, from employment, business, investments, royalties, gifts and the like" *Black's Law Dictionary* 831 (9th ed. 2009),

and "a gain or recurrent benefit that is usu[ally] measured in money. . . ." *Webster's Third New International Dictionary* 1143 (2002).

The $142,000 in the Joint Account belonged to the account's owners—the Plaintiff and the Defendant—and the Defendant's withdrawal of money that belonged to him did not represent a gain or benefit to him as an owner of the funds. The money did not come in to the Defendant as an increment or addition, and he did not receive the money because it already belonged to him. Money that a party to a joint account withdraws simply does not fit into the definitions of income.

Therefore, the Court finds that the $142,000 was not "income" for purposes of the SOFA, and the Defendant's failure to report this withdrawal was not a false oath that he knowingly made with fraudulent intent. In sum, the Court finds that the Defendant's failure to list the $142,000 withdrawal he made from the Joint Account on the SOFA does not result in a violation of § 727(a)(4)(A).

### 3.   The Defendant's Withdrawal of $20,764.58 from the Joint Account

Next, the Court will address the Defendant's withdrawal of $20,764.58 from the Joint Account after the Plaintiff attempted to close the Joint Account. According to the Plaintiff, these funds should have been listed on the Defendant's SOFA as income because the money belonged to her, not the Defendant.

The Court finds that the Defendant's withdrawal of the $20,764.58 from the Joint Account constituted income that the Defendant should have reported on his SOFA. As the Court stated *infra*, these funds belonged to the Plaintiff as a result of paycheck deposits from her business that were being made into the Joint Account after the Plaintiff had attempted to close the Account. The Defendant admitted that he knew that the Plaintiff intended to close the Joint

Account in February 2008, yet he made withdrawals from March 2009 through June 2010. (Trial Tr. at p. 63, lines 23-25; p. 64, lines 1-3.) These funds were certainly a gain or benefit that the Defendant received. Because these monies were income, the Defendant was required to list these funds on his SOFA.

The Court finds that the Plaintiff has established that the Defendant's discharge should be barred under § 727(a)(4)(A) because he did not list the $20,764.58 on his SOFA. First, the Defendant's SOFA is a statement under oath. Second, the SOFA was false because it failed to report as income the $20,764.58 that the Defendant withdrew from the Joint Account. Third, this omission was knowingly made by the Defendant. He testified that he did not disclose the withdrawals he made from the Joint Account after the Plaintiff attempted to close the Account. Fourth, the Court infers from the circumstances that the Defendant made the false statement with the intent to deceive. The Defendant knew that the funds in the Joint Account were coming from the Plaintiff, and not from any deposits he made. The Defendant was receiving the monthly Joint Account statements that reflected these deposits. The Defendant did not make any deposits into the Joint Account after February 2008. (Pl. Ex. No. 10.) His failure to list the withdrawals as income shows a reckless disregard for the truth. Finally, the Defendant's failure to report these withdrawals as income relates materially to the bankruptcy case. The failure to report over $20,000 in income certainly concerns the existence and disposition of the Defendant's property. Moreover, this false oath prejudices the Defendant's creditors because they did not receive an accurate picture of his financial condition.

Accordingly, the Court finds that the Defendant's failure to report the withdrawal of the $20,764.58 from the Joint Account violates § 727(a)(4)(A), and his discharge therefore is denied.

### 4. The Defendant's Failure to Disclose the Joint Account on the SOFA

Although the Court has already found that the Defendant violated § 727(a)(4)(A) by failing to report the withdrawal of the $20,764.58 from the Joint Account, the Court will also address the Defendant's failure to list the Joint Account on the SOFA. The Defendant filed his bankruptcy petition on October 26, 2010. The Joint Account was not actually closed until July 2010. Schedule B of the petition requires debtors to list bank accounts in existence at the time of the petition. The Joint Account had already been closed by the petition date. Thus, the Joint Account was not required to be listed on the Debtor's Schedules. In paragraph 11 of the SOFA, however, the Defendant was required to list all financial accounts that were closed within one year of the filing of his petition.

The Court finds that the Defendant's failure to disclose the Joint Account on his SOFA is an additional violation of § 727(a)(4)(A). As the Court has already stated, the Defendant's SOFA is a statement under oath for purposes of § 727(a)(4)(A). The SOFA is clearly false. Paragraph 11 requires a debtor to list all financial accounts held in the name of the debtor that were closed within one year immediately preceding the commencement of the bankruptcy case. The Debtor did not list the Joint Account under paragraph 11 or anywhere else on the SOFA. It is a debtor's role to carefully consider the questions posed and answer them accurately and completely. *Armstrong v. Lunday (In re Lunday)*, 100 B.R. 502, 508 (Bankr. D. N.D. 1989). "The trustee and creditors are entitled to honest and accurate signposts on the trail showing what property has passed through the [d]ebtor's hands during the period prior to his bankruptcy. It is not the debtor's responsibility to decide which assets are to be disclosed to creditors; rather, his job is simply to address each question and answer it accurately and completely." *Costello*, 299 B.R. at 899 (citation omitted).

Further, the Court finds that the Defendant knew the SOFA was false and the omission of the Joint Account was made with the intent to deceive. The Defendant was making withdrawals from the Joint Account up until the time it was closed, just a few months prior to his bankruptcy filing. The omission of the Joint Account from the SOFA created an erroneous impression that there was no financial account of the Defendant that had been closed within one year of the bankruptcy petition. The Defendant's failure to list the Joint Account shows a reckless disregard for the truth.

Finally, the Court finds that this omission on the SOFA relates materially to the Defendant's bankruptcy case. The existence of financial accounts bears a relationship to the estate and concerns the discovery of assets and the existence and disposition of the Defendant's property.

Therefore, the Court finds that the Defendant's failure to list the Joint Account on his SOFA warrants the denial of his discharge under § 727(a)(4)(A).

### D. The Plaintiff's Request for Attorney's Fees and Costs

Finally, the Court addresses the Plaintiff's request for unspecified attorney's fees and costs incurred in prosecuting this adversary proceeding. In support of her request the Plaintiff cites *Cohen v. de la Cruz*, 523 U.S. 213 (1998) for the proposition that § 523(a)(2) is not limited to the actual amount transferred to a debtor in reliance on fraud or misrepresentation. Rather, "'any debt . . . for money, property, services, or . . . credit, to the extent obtained by' fraud encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor." *Id.* at 223. Because the Court has found that the Plaintiff did not prevail under § 523(a)(2)(A), she is not entitled to her attorney's fees under this case authority or any other case

law of which this Court is aware that is applicable to these circumstances. Neither does the

Bankruptcy Code grant a statutory right to attorney's fees to a plaintiff seeking a determination

of the dischargeability of a debt. Nor has the Plaintiff presented evidence of a contract between

the parties making the Defendant liable for those fees and costs. Rather the Court adheres to the

American Rule, under which a prevailing litigant is not ordinarily entitled to recover attorney's

fees unless a federal statute or enforceable contractual provision authorizes such recovery. *In re*

*Olde Prairie Block Owner LLC*, 460 B.R. 201, 203 (Bankr. N.D. Ill. 2011). This rule applies to

litigation in bankruptcy courts. *Califf v. Park (In re Park)*, Bankr. No. 00 B 17572, Adv. No. 00

A 00881, 2002 WL 2012580, at *4 (Bankr. N.D. Ill. May 30, 2002).

Accordingly, the Court denies the Plaintiff's request for attorney's fees and costs incurred

in the prosecution of this adversary proceeding.

## V. **CONCLUSION**

For the foregoing reasons, the Court finds that the Plaintiff's claim under § 523(a)(2)(A)

fails. The Court further finds that the Plaintiff has demonstrated that the $20,764.58 debt owed

to her by the Defendant is nondischargeable under § 523(a)(6). In addition, the Plaintiff has

established that the Defendant violated § 727(a)(4)(A) when he failed to list withdrawals totaling

$20,764.58 as income on his SOFA. The Defendant also failed to list the Joint Account on his

SOFA in violation of § 727(a)(4)(A). As a result, the Court denies the Defendant's discharge.

**ENTERED:**

DATE: *July 31, 2012*

*Donald R. Cassling*
**Donald R. Cassling**
**United States Bankruptcy Judge**